v. American Home Assurance Company, Fireman's Fund Insurance Fund, Oakwood Insurance Company, and Swiss Reinsurance America Corporation. And I understand that we have Mr. Shulman here for the appellant and that you would like to reserve, is it seven minutes for rebuttal? Yes, Your Honor, please. Okay. Fire away. Thank you. Good morning. May it please the Court. Your Honors, there are a number of issues subject to this appeal. And if it pleases the Court, we'll begin with the issue of the advocate limit policies. But all of the issues on this appeal involve the most basic and fundamental tenets of California insurance coverage rules and interpretation. Those are that every word in an insurance policy must have meaning and be interpreted accordingly. That no word in an insurance policy can be said to have been placed in there accidentally. That an insurer's reasonable interpretation of a policy is not where the inquiry ends. Because if the insurer has a second reasonable interpretation of a policy provision, that policy provision is ambiguous. And ambiguity is resolved in favor of coverage as a matter of law. And then, of course, as the drafters of policies, the insurers are obligated to clearly, unambiguously, and conspicuously state that which the policy that they've drafted covers and that which it does not. The District Court erred when it granted summary judgments to Swiss Re, American Home, and Central National on the aggregate limit issues for five independent reasons. The first is that all the parties agree that California law governs this case. And there are two California cases addressing this issue, sub-policies, aggregate limit policies. And both of those cases held that where an insured pays premiums for a fraction of a year, prorated premium for that fraction of a year, the insured is entitled to the full aggregate limit for that period. And the reason is that the prorated premium reflects a shorter period of time for which the insurer is on that risk and not a reduction in the quantum of coverage. Can I ask you, would it be possible under California law, in your view, for the insured and the insurer to negotiate a different situation where there was both a limited time period that was covered and a lower or prorated aggregate limit, if that were laid out more explicitly? Most certainly. And there are policies in which that is done. And those are, frankly, the cases that the insurers rely on here where the policy specifically says, for example, there is only one combined single limit for the duration of the policy or of the policy period. And your view is not that it is impossible to contract that way, just that this language is susceptible to the interpretation that you're advancing and therefore ambiguities are construed in your favor. Correct, Your Honor. And it is not only not impossible, it is very possible. And California law requires that if that is what the insurer is intending to not provide a fresh aggregate limit for a period. And again, the California cases, as those around the country say, no matter how short, even a day, if the insurer pays a prorated premium for an additional day, that is not just merely an extension of the policy. So not only can the insurer negotiate that. It is an extension of the policy, but it doesn't override the policy term that triggers a new annual aggregate after an annual period. Correct. The expiration date of the policy changes. You then have a new annual period. Right. In other words, the reason I jumped on that is you're not asking us to conclude that these things that purport to be extensions aren't, in fact, extensions. You're making an argument about what the impact is of the extension. Yes, Your Honor. And whether we call it an extension, however we characterize an extension as a fine way to do so. You're exactly right, Your Honor. The point is that once that annual period ends and a new annual period begins, provided that the insurer has paid a prorated premium for that post, that 366th day going forward, the insurer is then entitled to a new aggregate limit unless, and to Your Honor's point, because the cases speak to this also, unless there is an intent expressed in the policy to aggregate. So in the Swiss Reinsurance case, we've got a declarations page that in contrast to the other two describes the aggregate limit as a number and a policy period as something that's longer than a year. It doesn't describe the aggregate limit with reference to any annual trigger in the way that the other ones do. Doesn't that override the sort of form language of the underlying policy and perhaps suggest that that case does fall on the side that you acknowledge can exist, which is where parties have expressly contracted for something limited? I believe we arrive at the same conclusion but for different reasons because you're exactly correct. It is very different policy language. So the Swiss Re policy makes a distinction between policy period and policy year. And under California law, those two things cannot mean the same thing. So you get coverage in a policy year but the policy period in this case is more than a quote policy year. And in your view, it's paragraph 5B of retained limit for the Swiss Re policy that says, basically during each policy year shall not exceed the aggregate amount stated in item 6B of declarations and 6B is the 5 million aggregate. Correct. And you're saying that that is the cross reference that ties the aggregate of 5 million to a policy year. And yes, and the fact that in the same provision, it makes reference to the policy, it makes reference to both the policy period and the policy year as it relates to the per occurrence limit versus the aggregate limit. So it's in, if the policy contemplates at least the reasonable possibility that you have a limit of $5 million per occurrence, you have a $5 million limit per policy year. We have two policy years because there is a second, you have one policy period, two policy years because the first policy year extends beyond. Hypothetically, if you have a one year policy on your automobile for $10,000 and you're negotiating a new car, whatever it is, it's extended for one month. Then if there's a delay in the delivery of the car, it's extended another month and then you get a 10-month policy. Are you saying that you have $30,000 in aggregate coverage for that year? I would respectfully suggest that an automobile liability context would be markedly different from the, let's change it to any other liability context. In a standard, it's extended for one year because I'm planning to sell my house. So I extend it for one month so I can sell the house and then there's a delay in the closing and I extend it for another month and then finally I take the final 10 months. And I insure my house for $100,000. Does that mean my house burns down and I have $300,000 in coverage? In that context, I believe, and I understand Your Honor's point, I don't believe that the analogy would apply that way. And I would agree with you that in a homeowner's context, it would not necessarily because homeowner's policies are not on a per current state. It doesn't work in the homeowner's context and it doesn't work in the automobile context. Well, because general liability policies are sold either on a per occurrence basis and then provide coverage in the aggregate, unlike in a homeowner's policy where, I mean, if you had one fire in that policy period, then you would get that, that limit would then be available to you. But where you have a general liability policy where you contracted to prorate the premium, to continue paying premium beyond the policy period. There's no question, but during the extended period, you have to have the same quantum of protection. Otherwise, you have a $10,000 policy and you extend it for a month and all of a sudden you have $800 of coverage, which is not what anyone can transfer. Just trying to see how all of this works. Do we know how this works categorically in California? There are two cases in California that we cited in our briefs and both of those cases found that the insured's second reasonable interpretation of the subpolicy issue mandated coverage for the insured based upon an ambiguity. Did that mean under those cases were there two aggregate limits for a continuing loss? Yes. Like in this case, you have a per-occurrence limit, you have an aggregate limit, and then you have no intent to, you have a, the policy goes beyond one year. And the court found that by accepting a prorated premium, there was three potential, three potential eventualities that could have resulted or that could have been intended. One of which is. Either it's just an extension, you're saying a lot of money, or it's a fractional, or it's a whole other limit. Precisely. But are those, were those cases in which second full limit would be recovered within a single year? Yes, Your Honor. And that is because the court, on the ground that the courts in those cases found that the insured's second reasonable interpretation was an ambiguity, yes. An ambiguity must be resolved in favor of coverage as a matter of law. The second reasonable interpretation is that for the stubbed period, you have the same level of protection, that it's the same, you have the same aggregate limit. It's a slightly different question to say that where you have a long tail loss that, that persists through several policy periods, that you get an additional, a full aggregate limit for stubbed periods. The logic behind it. I don't think there are cases that say that. It's an interesting question. And I would respectfully submit that Flint coat and the asbestos cases that we cite from California, in fact, so hold. And the idea, again, is that the insured is paying for that coverage. If the insured pays premiums 365 days over the course of the year, they get that coverage at any point during that year. If they pay that same prorated premium on the 366th day, they have to get something for it. And so the courts say that paying prorated premium for that 366th day doesn't reduce the amount of coverage that's afforded. It just reduces the amount of time that the insurer is on the risk by 364 days. And I presume one way that the insurer, the reinsurer, the excess insurer could guard against having to pay aggregate for two full, two distinct years because of a 10-day extension would be to have an anti-accumulation clause, an effective anti-accumulation clause that would essentially apply the reduction in the aggregate of the first year against the maximum of the second year. I appreciate, Your Honor, phasing to that. And in my last 30 or so seconds, you're exactly right. The other issue, another issue before the court is the Condition C, the anti-stacking provision. And Condition C for the last 60 years has never been intended to apply to multiple occurrences and long-tail claims. Can I ask you a question about one of the things I'm really struggling with and I'm going to ask the counterpart from Oakwood the same question. This is a summary judgment and it was a summary judgment seeking a declaration. The motion, the brief argument for the motion and the characterization and appeal of what that declaration is are different. What do you understand the district courts will have held with respect to how the anti-accumulation clause applies in this case? Thank you, Your Honor. I assume my time is up. May I briefly respond? Well, yeah, let's do this. You've reserved seven minutes for rebuttal. You can use some of that time now. But certainly, at a minimum, respond to Judge Robinson's question and we'll have plenty of time for you afterwards. Most certainly. Thank you. And again, Your Honor, Your Honor's question hits the nail right on the head because in order for Condition C to apply, the insurer needs to establish A, that there's one claim for which there's a potential, not even a potential double recovery, an actual double recovery. That's why Condition C only applies to single occurrences, to prevent a double recovery. So the declaration that was sought was, generally speaking, that Condition C applies. There was nothing before the district court as to which claim might potentially apply to both policies. How much was spent under Policy A for which the insurer would get a credit under Policy B? So the declaration, as you understand it, doesn't actually tell us anything about how it applies, it's just whether it could potentially apply. If you could line up a loss in year number two that was also subject to coverage in year number one, such that it would reduce the maximum. I interpreted it as essentially an advisory opinion. Yes. Thank you. And I know my time is up, unless the court has any other questions. No, we'll hear from you later on rebuttal. Thank you, Mr. Shulman. Thank you very much. So I understand the sequence in which we are going to hear from the appellees. We're going to begin with Mr. O'Connor, is that right? That's right, Your Honor. Very good. And you are here for American Home? That is correct. Very good. Please proceed. May it please the court, Kevin O'Connor for American Home. This case rises and falls on the aggregate issue, which is American Home's only issue in the case, on the plain and simple terms of endorsement number 15 to the policy. Endorsement number 15 does one thing and one thing only. Five terms, very short, clear endorsement that says it extends the policy term by 10 days by extending the expiration date from March 5th, 1977 to March 15th, 1977. And it also states that no other terms and conditions are changed. All other terms and conditions remain unchanged. So if there's a term or condition that says that you have a new aggregate maximum for each annual period, then the extension wouldn't change that term that required a new aggregate limit for each annual period? Well, let me answer it this way, Your Honor. As issued, the policy had three annual periods. One starting on the inception date and one starting on the two anniversary dates. March 5th, 76 and March, March 5th, 75 and March 5th, 77. A very significant term of the insurance policies is how many aggregate limits it had, which was three. The endorsement says that doesn't change. So if you had extended it not by 10 days but 10 years in the same language of the contract, you would say that the aggregate did not change? Well, that's an interesting... That's why I'm asking it. I would say this, Your Honor. This extension was for a specific purpose. No, no, no. Don't touch the hypothetical. I know it may not be. Tell me how you would interpret this because assume that the only difference is that it was extended for 10 years and not 10 days, but it had the exact same language in every other respect. Would your view be if we change no other variables that there is no increase in the aggregate? That those 10 extra years do not get new aggregate amounts? I would say if the reason for the 10-year extension was to secure replacement coverage. How do we... I guess I don't understand why you're saying the reason. Aren't we just looking at the language of the policy? Well, I think the language of the policy has to be looked at in the context in which the endorsement was issued, Your Honor. I don't think you can divorce those two things. Well, the reason is to get more coverage, right? And then I think then it begs the question if you're saying it's the reason to get more aggregate liability. Unless you're saying that we're going to get into parole evidence and have people come in and testify about what it was in their heart when they negotiated this, it seems we have to look at the policy language, right? And I think we do look at the policy language, Your Honor. We look at the wording that says no other terms and conditions are mentioned. And that's my question then. If it said we extend for 10 years, the reason I ask that is it seems obvious to me that if we were extended for 10 years and let's say on the anniversary dates, right, there were no odd stubs. We had round increments of one year. I think the answers would appear to me to be obvious that you get a new annual period each time. And what I don't understand is why the 10 days is any different. Because it's not an annual period, Your Honor. It's 10 days. What if it were 364 days? I think that would be an annual period, Your Honor. There'd be no definition. But it's not a year. Well, it's, I don't think. Do we go to 180 something? And if you get over half, we're rounding up or rounding down? I think the term annual period doesn't necessarily mean exactly one year. So what does it mean? It means about a year. I mean, the. I thought insurance was all about actuaries and precision. I guess, I don't know what about a year means. How would a court adjudicate what's about a year? I think you'd adjudicate like you'd adjudicate any other issue. You take the facts and you apply them to the law. If it was going to be exactly a year, it would say exactly a year. I mean, here, we've got a policy that has three annual periods. We've got an endorsement that says no other terms and conditions changed. And all it does is it says it extends the expiration date. The expiration date of what? The last annual period of the policy. All of those things. Can you tell me that the page, and I'm sorry, this is probably the reason, but the page where it says that there are three annual periods. I mean, I know the date range of the policy, so I don't need the page telling me that. It's the declaration page. We've got the premium broken down into three installments. Can you point to a page in the appendix perhaps? So that's 284? 284 is the declaration page. And if you turn to the policy form itself, section 3C refers to each annual period commencing with the effective or anniversary date. I'm sorry, what page are you on now? That is page A302. And it's under the heading and sharing agreements, three limits of liability, 3C. Right, so commencing, so in order to accept your interpretation, we have to understand that 3B, $10,000 in the aggregate for each annual period, we have to assume that that means something other than an annual period that lasts for a year beginning on the anniversary date of the contract. I think you've either got to take the 375-day period ending on March 15th as an annual period, or you've got to take the 10-day period starting on March 5th, 1977, running to March 15th, 1977, as an annual period. I don't think you can take 10 days into the term annual period. If they had renewed this for a year, and then canceled it after 10 days, you wouldn't say that they didn't get a new aggregate for an annual period. The fact that it's 10 days doesn't change your coverage, does it? If it was a cancellation, if the policy was originally put in place for the full year, and cut back to a shorter time period, that's a different case. What is your position? Is it that if a policy is extended, say 34 days, that the policyholder has one-twelfth of the aggregate limit that was available in the prior 12 months? No, Your Honor. It's my position that particularly in this context, where you've got a short extension while renewal coverage is being put in place. Then what is the aggregate limit? It's $10 million for the one-year plus the 10 days. She's saying they get no additional aggregate limit, that if they added an entire year, they would get an entire year's extra aggregate limit. But if you renew anything shy of a year, you get none? We didn't renew, Your Honor, for... Or extend, forget the word renew. We extended, and the results under American Homes' reading of this situation and the policy language is that they would get exactly what they wanted, which is a three-year policy with $30 million in aggregate limits. The renewal policy with $10 million, or the renewal policies, there were three policies that replaced the American Home policy. I guess the problem is when you say things like what they wanted. If we were getting into a factual analysis and you had depositions and you were taking parole evidence, we could then analyze what people wanted if that were the test. It sounds to me the question isn't what anyone wanted. The question is what does the language, the policy dictate, right? Well, that evidence is in the record, Your Honor. It was in the summary judgment record, which was evidence as to the whole renewal process that the million was trying to renew its policies, couldn't get it done in time. Well, but I mean, when you said what they wanted, the question is whether they wanted in the aggregate, what each party thought was the effect on the aggregate limit. That's not it, right? Wanted was probably the wrong term, Your Honor, but the situation was that they were trying to renew their policy for the $10 million aggregate. They eventually did. Under millions, or Ferguson's version of the facts, over the three years of the American Home policy and the one year of the following policy, they don't get $40 million in aggregates, they get $50 million in aggregates. Can I ask you this question? If we were to disagree with you that your interpretation of the policy is unambiguously required, if we were to find that there are two reasonable readings of the policy, one is yours and one is your adversary's, would you agree that under California law, the tie goes to the insured? No. Okay, tell us why. I think if you look at, California has statutory rules of construction that apply here, and one of them is the first, where you go first with ambiguity is to try to determine what the party's intent was. So I think we'd have to go, if you were to agree that there's an ambiguity here that we've got a reasonable interpretation and million has a reasonable interpretation, I think there's a factual inquiry. And if we come to intent, and if we were to find that there's no ascertainable intent, what is the next canon of interpretation that we would resort to as a tiebreaker? I think there are provisions in California law, again, statutory provisions that say, specifically drafted provisions of a policy, like endorsement 15 to the American Home Policy, take precedence over pre-printed forms. And I would say we go there, and we would look at the endorsement, which clearly says that no other terms, all other terms are. What does the record say about who negotiated on behalf of the policyholder? The policyholder had a broker. There's correspondence in the record from the policyholder, between the policyholder and its broker, talking about... But this policyholder didn't have a risk manager who is an insurance sophisticate who sat down and negotiated the insurance sophisticates of the insurance company? And absent that, then the policy gets construed against the insurance company. Because if you ask what an insured wants, they want as much coverage as they can get if they're in trouble, and they're not experts in this, because they don't have a risk manager who is negotiating with the insurance company to come up with something that fits their needs, other than their, as it were, greed to have as much coverage as they possibly can when they're in trouble. Well, those are factual issues that have to be looked at. There are assumptions that people make. I mean, what about the two cases your adversary cites? California law on exactly this situation. Well, I think he tried to make them do a little bit too much work, Your Honor. Those cases would not be precedential, even in California. Their trial court decisions, California law says the trial court decision is not precedential. They couldn't cite them in California as a statement of California law. So I don't think they can cite them here in New York as a statement of California law. Is this an issue that could usefully be certified? I don't think there are. There is. I think this case turns on application of well-established California law. The interpreting policies according to their ordinary and plain terms. Giving every policy word reasonable meanings. The California code regarding priority of policy. Your adversary is of exactly the same view. However, his view is opposite to yours. And so the question becomes, is this a matter that we can resolve here? In this circuit so far from California? I think for the reasons stated in our briefs, we can decide this issue in American Homesteader. And I think that the record supports that, and I think the law supports it. Okay. Thank you very much. We kept you up beyond your time, but thank you very much. We will now hear from Mr. Fox on behalf of Oakwood. Is that correct? Yes, Your Honor. May it please the court. Brian Fox on behalf of the defendant, Appellee Oakwood Insurance Company, which is the successor to Central National Insurance Company. Also, Ferguson has appealed two district court rulings in favor of Central National. Both of which honor the language of the contracts. First, the district court parking is going to summary judgment to Central National that the 27-day extension of the expiration date of two one-year policies in September and March 5, 1979, an umbrella policy and an excess policy that sits directly above that umbrella policy. Each with aggregate limits of $5 million did not create a second set of $5 million aggregate limits under each policy. Specific to Central National, I note that we have contemporary documents that show that the parties intended to merely extend the two existing policies, including their existing limit. We have policy language. Limit liability of both 1979 Central National policies states that the $5 million aggregate limit for each policy is for each annual period commencing from the effective date. And both policies define annual period as, quote, each consecutive period of one year commencing from the effective date of this policy, unquote. Obviously, 27 days is not a period of one year. But, I mean, I would have thought that language would have cut the other way, that it makes it very clear that the aggregate max clock restarts on the 365 days after the initiation of the policy and each time thereafter. Well, respectfully, that's not the language indicates. The language defining annual period, we know that the policy, how this policy defines annual period. And it's each consecutive period of one year. And, first of all, 27 days, again, is not a year. And second of all, we have the, we know that the 27 days were added by endorsement, which only did two things. It changed the expiration date of the existing policy and it provided for additional period in exactly the proportion that would cover the extended period. The endorsement made no other changes to the policy, including to its applicable limit. And the policy extension was entirely consistent with the policy holder's request, this goes to intent. You should, you should pass. Can I ask a similar question to what I asked your colleague? If the policy had been extended for 364 days, is your view the same that you don't, that would not constitute an additional annual period? Yes, because, because this policy language says, it says what it says, and 364 days is not a consecutive, is not a period of one year. I would add, I would add, however, that the qualification I would make is if we had, if we ever, we envision here that the parties, instead of an extension intended to write a policy, then that could be a factor here. But here, every textual and contextual clue indicates the party's intent was to merely extend the existing policy with the existing limit. There was a letter from the broker which stated that the policy holder which to quote extend the policy period, unquote, and the extension would be made at quote the same terms, conditions, or premium basis as the current policy, unquote. Nowhere did the parties discuss new aggregate, and nowhere did the endorsements provide for them. If, I do have a second issue, if, can I? Can I, can I ask you on the second issue? In your brief here, you say, given the clear and unambiguous language of the non-accumulation policy, the central national umbrella policy and the central national access policy are reduced by the amount of the same losses also covered under the first central national umbrella policy and access policy. In your request for a declaration below, you ask for something less qualified. You ask for a judgment that the non-accumulations have essentially resulted in a reduction of the aggregate limits without doing the comparison of the loss to loss. What is your understanding of what the court actually ordered by granting your summary judgment? Right. So, as, as your, your, your honor correctly noted, this is a, this was a declaratory, this is a declaratory judgment action. The, and, and indeed central national, national move for, for summary judgment. The declaration that we saw, and the, the declaration that, that was the district court's grant of summary judgment, it, it, it was that, that particular loss under, under both the earlier central national policies, the 1979 policies, and, and the later central national policies, the 1980 policies. If a particular loss is covered under both the 79 and 80 policies, then the aggregate limit of the 1980 policy is reduced by the amounts paid for that loss. So it leaves open the question of actually applying it by lining up a particular loss and saying it was covered in 79 and 80. You're not saying we should assume because they actually lost the, the aggregate in 79, therefore the 80 aggregate drops, because you have to parse it on a loss by loss basis. Is that right? Everybody, you're agreeing to that? So, so with, with all due respect to, to Ferguson's counsel, Ferguson appears to be deliberately obtuse on this. As, as, as it's, as it's contained. Let's not say things like that. Why don't you just represent your position, your position without characterizing how opposing counsel is, let's not. Yes, Your Honor, I apologize. I, I would just, Ferguson, Ferguson's argument, it, it, it reflects a, a misunderstanding of the nature of these underlying, these underlying claims here. Each, each of these claims involves a single continuous injury that implicates multiple successive, successive policies here. The non-cumulation provision is, is triggered by each, each of the plaintiff's claims. All of these claims, all of them, there are thousands of them. All, all of them are, involve a successive injury. And, and, and the, the manner in which the district court ruled on, on this issue, it, it cut through all, it cut through all of these procedural arguments that, that Ferguson has, has advanced because it speaks to the, in the context of any loss that is covered under, under both the 1970 policy and the corresponding 1980 policy, which reduces the, the limit of, of the 1980 policy. That's what, that's what the district, that's what we saw. That's what the district court ruled. And, and, and that takes care of, of, of, of any, of, of any comparisons. Because the fact is, Central National has been paying these claims for over a decade now. And all of these claims are for a, a, a successive. Okay, so, so that's, that's the piece I'm trying, so if everybody agreed in the principle that any loss that was covered under 79 would trigger a reduction in the maximum aggregate, to the extent that loss is also claimed in 80, if everybody agreed to that proposition, you'd still have the question of, okay, were there losses covered in 79 that were triggered in 80? And, and I guess I'm trying to understand whether a judgment in this case purports to resolve that question or purports to leave that open for further litigation? There would be no further litigation and, and, and once that ruling is made by operation of these claims being paid, there's no, there's no dispute about that issue. There, these claims, these claims are paid and, and, and indeed they typically do, do implicate both the 79 and 1980 policy periods. And. Over those claims, so, so maybe I'm, maybe I'm not understanding. You have your underlying claim, right? The person who's injured and makes a claim against insurance and you've got a continuous trigger theory. Don't they still have to show what period they were exposed? And so if their exposure period covers both 79 and 80, then you'd be in the game on that claim? But if they didn't, then you wouldn't? If a loss, they're not exclusive if a loss is covered. So if a loss is not covered under the 79, 1980 policies, then the 79, 1980, then the 1979 and 1980 policies don't respond to the given, to the Smith claim, to, to the Jones claim. So if, if, if a loss is covered, then there's no implication of the, of the non-accumulation provision at all. So you still, you can't just assume, you can't just look at the total payout under, in 79 and say the aggregate's reduced in 80. You'd have to sort of parse it to make sure that the claims that you were reducing the aggregate for in 80 were in fact claims that were also on the risk in 79. You, you, you could hypothetically have, have a claim which, for its exposure begins, begins during the 1980 policy period. That could hypothetically happen if that, in these thousands of claims, that likely has never happened. Okay. But it could hypothetically have, have, have, have happened. Okay. That's helpful. And. Okay. I think we have kept you up beyond your time. Unless there are any questions from the panel right now, why don't we hear from, let's see. May I just note one other item very quickly, Your Honor? I'll give you 15 seconds for the last one. That's all I'll need then. I appreciate it. I, I, I just wanted to note that on the aggregate limits issue, the 1979 excess policy is expressed as subject to the same definitions as in the umbrella policy. That, that reference is at SA 795 condition number 2. Thank you. Very good. Thank you very much. Let's see. We have Attorney McColgan. Is that next up? I think he's appearing by Zoom, Your Honor. Oh, it, it does in fact say, my note does say by Zoom. You, you are right. We will turn our attention to the screen. Mr. McColgan, you're appearing on behalf of Swiss Re. Yes, Your Honor. Can you hear me? Yes, we can. Please proceed. I may please report. Arnett McColgan, for defendant, FLE, Swiss Re Insurance, America Corporation, as administrator for 21st Century Premier Insurance Company, successor in interest to Foreign Insurance Company, SRAC for short. The Foreign Insurance Company policy, UB 100963, insured Chameleon Corporation for the policy period December 18, 1984 to April 1, 1986. The foreign policy was at all times, insurance policy of 15 and a half months duration. The policy was never changed or extended. The policy provided a single $5 million aggregate limit, which SRAC. And now, Your Honors, I, you know, based on your questions for other counsel, I wanted to skip ahead in my discussion to the case law that Ferguson relies on, especially the Flintcoat case. The analysis here with regard to the foreign policy is straightforward. The cases upon which Ferguson relies are distinguishable and unpersuasive. Ferguson's case has addressed situations where a policy is extended from its original policy period or is cut short. The cases suggest that sometimes it's extended, sometimes not. But that is not our situation. The foreign policy from the outset was written for the 15 and a half month policy period, full stop. And from the outset, the foreign policy provided a single $5 million aggregate limit. With respect to the Flintcoat case specifically, there are three differences. First, the Flintcoat used a simple policy language providing a separate aggregate limit for each annual period, which in turn was defined in the policy to mean each consecutive policy of one year commencing with the inception date of this policy. Second, the foreign policy was written for a 15 and a half month policy period from the outset while the period of the Flintcoat policy was modified post issuance to extend or cut short the original period. So let me just ask you, I understand your argument that these were already written, that the policy was written from the inception for a period longer than 12 months but shorter than 24, but what do you make of the policy's distinct usage of two different terms, policy period and policy year? Normally when we interpret a contract or a statute, we presume that different terms were chosen specifically to have different meanings. Could you tell us what should we read from the usage of those two distinct terms? Your Honor, as the district court found, the single use of the phrase policy year in the pre-printed form does not create an ambiguity. The pre-printed form is meant to be used with policies of different lengths. As we've heard... Right, this is a different length, right? I could see that if a policy was just a year, you would say, well, policy year and policy period perhaps are synonymous. But because we know that these policies are written for different terms, different lengths of time, isn't it sensible to assume that policy year has a different meaning from policy period? No, Your Honor, it's not. So why does a pre-printed form use a distinct term? So that it can be used with policies that are three years, like we've heard in some of the other FLE arguments. Okay, so a policy year and a policy period are not synonymous terms. Your view is that a policy year only applies to full calendar years or 365-day years? Yes, Your Honor. So it's not a term that was used by accident. It means something different than the policy period. Well, once we accept that, why should we accept your construction that it only refers to a full year and not to the commencement of a different year or a period that falls in a different year? Your Honor, I think my time is up. May I respond? Yeah, please do. So as the district court found, the declarations page, which was specifically negotiated because you have to know what your limits are and what your policy period is, control in this instance over the pre-printed form, which is meant to be used with policies. But it's cross-referenced, right? Isn't it cross-referenced? Where am I? I may be looking at the wrong period here. What's the page? Could you just direct us? I want to make sure I'm looking at the right language. What is the page in the appendix to which you're referring with the specific declaration? Yeah, the two pages I'd like you to direct us to are the, as you say, the negotiated for limit as well as the form language. Sure. The declaration page is at A128. Yeah. And then the pre-printed form page that cross-references that, 6B, 126. So I guess my question then is that, I understand you're saying, well, the limit of liability is in 6B, but we don't know what limit of liability means except for the fact that it is mentioned on page 126, and it is cross-referenced only with reference to each policy year. So I understand if there was a conflict between the two, and if page 128 said, and there shall be an aggregate of $5 million for the entire policy period of December 18th, 1984 to April 1st, 1986, we might say, oh, these are two incompatible statements. Therefore, we must have the one on 128 override 126. I understand that argument. The problem is, I don't see where on 128 it says what period the limit of liability covers. That, I think, is only told to us in one place, which is 126, and that says it's for a policy year. So where's the inconsistency, I suppose, is my question. Well, we don't think there is. We think that the single use of the term policy year in the pre-printed form does not apply because we do not have a multi-year policy period. But if it were a multi-year policy, you would agree that you get the aggregate as $5 billion per year. Yes, you're right. Okay. When does an annual period end, and after how many months? Twelve months, Your Honor. I see. Okay. So your view is that it only applies for a full year, and if it's not a full year, it's not a year. I guess that's your argument. Especially in this instance where the policy from the outset was written for 15 and a half months with a stated limit on the declaration page of $5 million in the aggregate. And, you know, I would further note that the district court even considered that if there was an ambiguity, and you look at the contemporaneous evidence, that you would also come to the conclusion that there is a single $5 million aggregate limit. Okay. Thank you very much. We appreciate your peering by Zoom, and we very much appreciate your arguments. Now, we will hear from counsel for Fireman's Fund attorney. Why don't you tell me how to pronounce your last name? Michael Katula, Your Honor. Mr. Katula. So why don't we hear from you? Good morning, Your Honors. May it please the Court, Michael Katula from Erifta, Brattler on behalf of Fireman's Fund Insurance Company. This issue is different from the issue that you've heard from other counsel today, and I don't believe Mr. Schulman has addressed it yet. And that is whether the Fireman's Fund third way of access policy in one year is required to drop down in place of an insolvent Comstock Insurance Company policy in the second layer. Comstock is not only insolvent, but they've been liquidated in California. And the district court granted Fireman's Fund's motion for partial summary judgment that the Fireman's Fund policy contained clear language that was anti-drop down, and that had been enforced by no less than two published California Court of Appeals decisions. Needless to say, this court is sitting in diversity jurisdiction and is applying California law. There are no cases dealing with the language in the Fireman's Fund policy that forbids drop down in place of insolvency. The Spann case from one division of the California Court of Appeals, and the Wells Fargo case from yet another division of the California Court of Appeals, much like the first department and the second department in New York. So we have two different divisions of the California Court of Appeals, both agreeing that the language in the Fireman's Fund policy prohibits drop down. Now, the language specifically in the Fireman's Policy says that the underlying limits must be exhausted, quote, solely by reason of losses paid there under, unquote. So the Fireman's Policy, at the third layer, will afford $10 million of coverage once the underlying insurance has been exhausted solely by payment of losses there under. Needless to say, the Trump stock policy won't be paying. If Ferguson wants to dip into their own pocket at some point to meet that $10 million, then they can prove that limit, and they can reach the fireman's layer. The defense settlement clause in the same policy refers to occurrences that are not covered by the underlying policies listed in Schedule A, whether collectible or not. Yes, Your Honor. What does that mean? When is it collectible, and when is it not collectible in terms of that phrase? Well, obviously, a policy that is insolvent is not collectible. But that phrase deals with not covered. Your Honor dealt with this concept in the Unicorn v. Munich Reed case here in this court. Because it's dealing with what? An occurrence? But it's dealing with a provision. You're referring to something in the first date policy, I believe, which Ferguson argued. But then, you know, you... They admit that this claim... I'm sorry? But you adopted the provision that was not consistent with yours, and you adopted it. I would disagree with that, Your Honor, for the simple reason that what they refer to has to do with paying a defense cost for a claim that is not covered by the underlying insurance. And that language... So, not collectible means not covered? No. If I'm... We may be talking past each other. I want to make sure that's not happening. Quite possible. So, there are two arguments that Ferguson makes. One is that the first date policy has a liberalization clause. And that has a very peculiar shifting effect here. Because here, this is talking about whether things are collectible or not. No, Your Honor. The finance fund policy has a liberalization clause endorsement. My policy, at the third letter. Yes. And the district court said that it was like a broadest primary clause. In that, it says that it's hereby agreed that in the event of a claim or loss for which insurance is provided by policy shown in the schedule of underlying insurance, the excess of which would be insured here under, except for terms and conditions of this policy, which are not consistent with the underlying insurance, this policy shall be amended to follow the terms and conditions. Of the applicable underlying insurance in respect to such claim or loss. Fireman maintains that that endorsement, that Judge Holden is correct, that that endorsement does not apply to a follow form to limited liability language. In other words, the fireman's policy language on limited liability, which says that the underlying insurance must be exhausted solely by reason of losses paid there by the liberalization clause. It's very specific. Right. It's very specific. It's very intentional. And it cannot be overridden by generalized wording. Correct, Your Honor. The district court in the Dexter Court case versus National Union affirmed a district court decision from Connecticut that addressed a broadest primary provision. But here's the thing. Even if Ferguson works, if the district court were to find that Ferguson was correct and that finance fund's drop down turns on the language in the first state policy, two decisions, the same two decisions of the California Court of Appeals, looked at that first state language, the language in the first state policy, and said that it does not require a drop down. In fact, the first state policy contains a provision and it's at page 879B in the record. And it more or less says the company shall be liable only for ultimate net loss in excess of the greater of the insured's underlying limit and amount equal to the limits of liability indicated beside the underlying insurance listed in the Schedule A of underlying insurance comma plus the applicable limits of any other underlying insurance collectible by the insured. Ferguson says the word collectible applies both to the Schedule A's underlying insurance and any other underlying insurance. Both the Span Court in California and the Wells Fargo Court disagreed. In Span, the California Court of Appeals, referring to almost identical language in the first state policy held, we, quote, we similarly conclude the language of the policy unambiguously employed that term collectible not in connection with the underlying insurance set out on the Schedule of underlying insurance, but with respect to any other, and I italicize, underlying insurance collectible by the insured. Quote, we conclude the language of associate's excess policy is not ambiguous. It requires exhaustion of the underlying limit by payment before the excess insurer must respond. Exhaustion by insolvency is insufficient. Then Wells Fargo, a second California Court of Appeals decision published said, the policy unambiguously employs the term collectible not in connection with the underlying Schedule of insurance, but with respect to any other unscheduled insurance collectible by the insured. Now, what's the difference between Schedule of underlying insurance and other underlying insurance? I would respectfully say that the Finance Fund policy identifies the Schedule of underlying insurance in its declarations and specifically identifies the first state policy and the Comstock policy as the Schedule of underlying insurance. I'm correct that the other insurance doesn't really matter. Right. Other underlying insurance may be additional insured coverage, which might be applicable to a situation. We don't have that in this case, but it could be other underlying insurance because the first state policy contains a typical excess other insurance clause, saying that there's excess over any other insurance. So you could see why the policy would be drafted in a way that would make the Schedule of underlying insurance have to pay before the next policy can respond, while at the same time requiring unscheduled other insurance, such as, you know, the possibility of additional insured coverage having to be collectible. Because if you then said, well, oh, you have an additional insured policy over here, but it was issued by an insolvent company, you would then not only have to exhaust all of the scheduled insurance out of your own pocket. Because you have a condition, your obligation to pay upon the collection of the other insurance, which may or may not be solvent. Well, Fireman's Fund does not. The way that the first, not only does the Fireman's Fund policy say that the underlying insurance has to be exhausted solely by reason of losses paid thereunder, the first state policy says that the Schedule of underlying insurance has to be paid, not by insolvency, and that any other underlying insurance, not scheduled underlying insurance, a Comstock is scheduled underlying insurance, has to be, any other insurance has to be collectible. And so, and both Spann and Wells Fargo in California Court of Appeals enforced that distinction. Now, I would also add. Why don't we just, why don't you take 15 seconds to just wrap up your thoughts. Yes, I would also add that the Fifth Circuit in the Transco case, the Fourth Circuit in the Radiator Specialty case, and the HILE, and the Seventh Circuit in the HILE case, all cited in our brief at 23 to 24, all follow the same rule that the word collectible in the first state language only applies to other non-scheduled underlying insurance. Thank you, Your Honor. Thank you very much. Mr. Shulman, you have reserved seven minutes for rebuttal, so we'll set the clock, and let's hear from you. Thank you, and again, may it please the Court, Jeffrey Shulman for Ferguson. The Court has been incredibly generous with its time today, so I will attempt to be brief. Thank you. Number one, with regard to the aggregate limit issues, some of the insurers take issue with the state trial court level decisions in Flint Co. in California, and they cite Federal Appellate Rule of Procedure 32.1, which as we note in our brief at page 13, only applies to citations of Federal written decisions. California has Rule 8.1115, which applies to cases occurring in California state courts, as opposed to cases before this court. So I believe that both of those cases are worthy of this court's consideration. In any event, if this court were elected not to consider those California decisions, the court could consider the cases that we cite, which similarly hold in New Jersey, Massachusetts, Washington, Illinois, Louisiana, and Stonewall in this case, in this court. With regard to the Swiss Re policy, it is correct that there is a distinction there because that policy was issued initially with more than a one-year period. Interestingly, Your Honors, in discovery in this case, Swiss Re provided a copy of what they claimed to be this policy, and it was discovered during discovery that the policy form that they provided in discovery does not speak to a distinction between policy period and policy year. And it turns out that that was not the policy ultimately issued to Ferguson, and the policy that was provided in discovery in error is in the record of A142 to A173. And what that demonstrates, if nothing else, is that Swiss Re knew and knows how to issue a policy for a period of one year. I'm sorry, that was a draft of the policy? Is your view that it was a draft, a preliminary draft? It was a different form, a different version of their policy form. But not the operative one. Correct. Once that was discovered, the correction was made, the correct policy was produced, all the parties before the district court agreed what the policy was, but the point being that Swiss Re has a form, a policy form, that it can and does use when it intends to not make a distinction between policy period and policy year. With regard to American Home, there was testimony before the district court that I think remains pertinent here, because the court asked all the insurer counsel about what is an annual period, what is a policy year, is it 364 days, 365 days, 366 days? And that question was also posed to American Home during discovery, and the response at a deposition was, that's, quote, not a simple question. And that's at the record at Supplemental Appendix 603. And it remains not a simple question, which is why summary judgment should not have been granted in favor of the insurers. The district court took, Your Honor also mentioned that which was or could have been in the heart of the insured at the time of contract. There is no evidence in the record as to what Ferguson intended, other than what Your Honor, I think, correctly suggested, which is that Ferguson Familian would have wanted as much coverage as it possibly could have secured at that time. The letter that American Home refers to makes reference to a $10 million, $10 million for the 10-day extension, for the 10-day extension, meaning that, and this is a letter not involving Ferguson, the broker and the insurer, but for the 10-day extension decades later, could certainly reasonably be interpreted as the insurer and the representative of the insured agreeing that we're going to extend this policy, it may not be for another full year, but the cases say regardless of how short the period is, $10 million for that extension. So if there is any evidence about what was in the heart of the insured, I believe that is consistent with that. With regard to Condition C, the counsel made reference to a single continuous injury and successive injury. That is not an occurrence. The question here is how many occurrences are there with regard to thousands of underlying asbestos cases, because occurrence, the word occurrence is what triggers these policies. And the question that must have been, needed to be resolved before the application of Condition C could be considered was whether the thousands of underlying asbestos cases constitute one occurrence, 10 occurrences, 10,000 occurrences. Well, but if there, even if there are 10,000 occurrences, right, if we're dealing with a continuous trigger framework, if 9,999 of those 10,000 claims are claims in which both policy years are potentially implicated, then wouldn't the cumulation provision or non-cumulation provision apply? It still wouldn't, no, because it still would not lead to the double recovery, right? The Condition C says if you have a policy in this year and a policy in this year, and we pay you for that claim in this year, we get a credit in the other. So you don't get paid $2 for a $1 claim. Whether or not we're going, we're exhausting horizontally, meaning across an entire layer of coverage across the span and then moving up, or allocating vertically and going up the tower and then moving along the tower, you still only have, because these are thousands of individual occurrences, you still, the insurers are still only responsible under no other circumstances other than to pay $1 for a $1 claim. There cannot be a double recovery in this scenario. So does it depend on whether covered means covered and actually paid by that year versus on the risk for that year? Most certainly. In the cases we cite in our briefs say that. It's similar to subrogation where the insurer has to pay before it can step into the shoes of the insurer. So too with Condition C, the insurer has to pay under the policy for which they are seeking a credit under the corresponding policy. Until that claim is paid, there can be no double recovery under the second policy. So the insurer was obligated, central national was obligated to say, here is a particular claim, here is the dollars we paid under this policy, and that's why we get a credit for those same dollars under a corresponding policy. That was never done. We didn't even get anywhere near close to that point because, again, even though California law says that each of these occurrence, each underlying asbestos claim is an individual occurrence, the court was never asked by central national to even make that determination. So again, I'm going back to the language because it talks about any loss covered here under is also covered in whole or in part under any other excess policy. You step back and look at the purpose, which is to avoid double recovery, and I understand that, but looking at the language itself, it seems like it wouldn't require the analysis you just described. It would require the analysis of whether or not the claim or bundle of claims were claims for which both policy years were covered, had provided coverage. And I agree with you. I think it's two steps. It's A, is it covered? And then B, is that covered claim paid? And I think your Honor is exactly right. And neither of those steps were undertaken by the district court. And central national didn't ask the district court to undertake any of those steps. But it doesn't say shall be reduced by any amounts paid to the insured on account of such loss, it says shall be reduced by any amounts due to the insured on account of such loss under such prior excess insurance. Due to the insured because it is covered. And if it's covered, it is owed. The only reason it hasn't been paid is based upon this assertion that there is a credit to which it is entitled because of coverage it afforded under another policy. Do I understand for thousands of claims, the insured has absorbed separate deductibles for self-insured retention for each of the thousands of separate claims? That is a good question, Your Honor. And if I, I'm happy to look at the policy. I don't know that answer off the top. I can certainly tell you very quickly. Ordinarily, companies would resist that. But it's obviously not in the case. Thank you. And if I may have 10 more seconds. Why don't you wrap up, absolutely. Thank you. With regard to fireman's fund, the first state of fireman's fund policies make a distinction between collectible and collectible or not. We know that the Comstock policy is not collectible. The fact that there is a distinction drawn between collectible or not means that there is at least some anticipation that if Comstock is not collectible, then fireman's fund drops down. Again, I thank the court for its time today and for the reasons stated in our briefs and on the argument today, we ask that the summary judgment in favor of the insurers by the district court be reversed in its entirety. Thank you very much. Thank you very much to all the counsel. It was a very helpful argument on all counts. We will reserve decisions. Thank you, Your Honor. Thank you, Your Honor. Thank you. Have a good day.